U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 1 0 2005

CLERK, U.S. DISTRICT COURT
By _____
              Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SAVOY IBP 8, LTD., | § | |
| | § | |
| Appellant, | § | |
| | § | CIVIL ACTION NO. 3:04-CV-2520-P |
| v. | § | (Bank Ct. No. 03-39123-HDH-11) |
| | § | |
| NUCENTRIX BROADBAND | § | |
| NETWORKS, INC., | § | |
| | § | |
| Appellee. | § | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is Appellant's Savoy IBP 8, Ltd.'s, ("Savoy" or "Appellant") appeal ("App.'s Brief"), filed January 10, 2005, from an Order of the United States Bankruptcy Court ("Bankruptcy Order") for the Northern District of Texas (the "Bankruptcy Court") decided September 20, 2004, denying Savoy's request for postpetition rent (the "Rent Motion").[1] Appellee Nucentrix Broadband Networks, Inc. ("Nucentrix" or "Appellee") filed its Response Brief ("Resp. Brief") on Feburary 25, 2005, and Appellant filed its Reply Brief ("Reply Brief") on March 21, 2005.  After considering the parties' arguments and briefing, and the applicable law, the Court REVERSES the Order of the Bankruptcy Court, and REMANDS the case for entry of judgment consistent with this Memorandum Opinion and Order.

## I.      Background and Procedural History

"This appeal pertains to a Chapter 11 bankruptcy case in which the Bankruptcy Court entered an order denying Appellant Savoy's motion to compel Appellee Nucentrix to pay alleged

---

[1] *In re: Nucentrix Broadband Networks, Inc.*, 314 B.R. 581 (Bankr. N.D. Tex. 2004) [hereinafter *Nucentrix*].
**3:04-CV-2520-P**
**Order REVERSING Decision of the Bankruptcy Court, and REMANDING for Entry of Judgment**
**Page 1**

post-petition rent obligations under a non-residential real property lease [(the "Lease")] and for

allowance of a purported administrative expense claim." Resp. Br. at 2.

On January 1, 2001, Savoy and Nucentrix entered into a Lease whereby Savoy leased

premises to Nucentrix for use "as the headquarters of their business operations . . . ." *Nucentrix*,

314 B.R. at 583.[2]  However, on September 5, 2003, Nucentrix filed for bankruptcy (the "Petition

Date").[3]  *Id.*  "Shortly before and following the Petition date, [Nucentrix's] senior management

determined that due to the projected winding down of their business operations, [it] did not need

all of the space leased under the Lease." *Id.* at 584-85.  Furthermore, senior management

determined further that the monthly expense of maintaining the Lease, $44,440.71 ("Original

Rent"), was greater than Nucentrix "could afford based on available cash and resources" on the

Petition Date. *Id.* at 585.  Accordingly, Nucentrix "determined the terms of the Lease were not

economically feasible," and "began to look for alternative, less expensive office space" after the

Petition Date. *Id.*

"Following the Petition Date, Carroll McHenry [("McHenry")], the Chief Executive

Officer of Nucentrix, approached Lucy Billingsley [("Billingsley")], the Chief Executive Officer

of Savoy's property management company . . ., to inform Savoy that Nucentrix intended to reject

the Lease because of Nucentrix's reduced space requirements and financial condition." Resp.

Br. at 3-4; *see also Nucentrix*, 314 B.R. at 585.  Subsequently, McHenry and Billingsley

---

[2] The Court adopts its background largely from the Bankruptcy Order.

[3] "On September 9, 2003, [Nucentrix] filed the Motion to Extend Time to Assume or Reject Unexpired Leases of
Non-Residential Real Property . . . (the 'Motion to Extend Time'), which included the Lease." *Nucentrix*, 314 B.R.
at 583.  Correspondingly, on October 6, 2003, "Savoy filed its objections to the Motion to Extend Time . . . ." *Id.*
Thereafter, "[o]n several occasions, the [Bankruptcy] Court extended the deadline by which [Nucentrix had to]
assume or reject the Lease.  By an agreed order entered on February 13, 2004 . . . the Court extended the deadline by
which [Nucentrix] must assume or reject the Lease to February 19, 2004." *Id.* at 583-84.

"entered into discussions regarding the premises subject to the Lease. These discussions took place at a meeting in mid to late-September 2003 and in telephone conversations thereafter."[4] *Nucentrix* 314 B.R. at 585. During these discussions, Billingsley, on behalf of Savoy represented to McHenry that Savoy would allow Nucentrix: (1) "to pay a lower base monthly rental rate of $11.25 per square foot, . . . plus reduced utilities, parking and operating expenses [("Reduced Rent")];[5] (2) to occupy a smaller area (the 'Reduced Premises') than the premises leased under the Lease;" and lastly, (3) "to occupy the Reduced Premises through April 30, 2004, unless extended by agreement of both parties." Resp. Br. at 4; *see also Nucentrix*, 314 B.R. at 585. Importantly, the Bankruptcy Court found that Nucentrix "*reasonably inferred* that this [reduction] would be a permanent concession by Savoy; not a concession which would allow Savoy to later assert the full lease claim." *Nucentrix*, 314 B.R. at 585 (emphasis added).

In light of Savoy's representations, "Nucentrix abandoned its search for alternative, less expensive office space, consolidated its property into the Reduced Premises, and from November 2003 through March 2004 (the 'Applicable Period'), occupied only the Reduced Premises." Resp. Br. at 5; *see also Nucentrix*, 314 B.R. at 585.

As the parties continued their discussions "from late October 2003 through mid-February 2004, Savoy accommodated Nucentrix by allowing Nucentrix to pay the amount of the monthly

---

[4] On February 19, 2004, Nucentrix filed a settlement motion, "in which [it] requested [B]ankruptcy [C]ourt approval of a purported settlement agreement." App.'s Br. at 12; *see also Nucentrix*, 314 B.R. at 584 ("Savoy responded by denying that the parties had an enforceable agreement and by filing a series of pleadings in order to challenge the settlement set forth in [Nucentrix's settlement motion]."). Subsequently, "[o]n April 12, 2004, the [Bankruptcy] Court entered an Order . . . finding that [Nucentrix was] judicially estopped from claiming that they had an enforceable settlement agreement with Savoy on or before February 9, 2004." *Nucentrix*, 314 B.R. at 584 (internal citations omitted).

[5] "The Reduced Rent [totalling] $12,135.94 covered base rent as well as utilities, parking, and operating expenses. Of the $12, 135.94, $10,215.94 was allocated for rent, and $1,920.00 was allocated to utilities, parking, and operating expenses." *Nucentrix*, 314 B.R. at 585.

**3:04-CV-2520-P**
**Order REVERSING Decision of the Bankruptcy Court, and REMANDING for Entry of Judgment**
**Page 3**

obligations that would have been due under the Proposed Lease, or $12, 135.94," instead of the

Original Rent of $44,440.71.[6] App.'s Br. at 9; *cf. Nucentrix*, 314 B.R. at 585-86. "[D]uring the

Applicable Period, [Nucentrix] paid the Reduced Rent as follows:

| Check Date | Check No. | Amount | Purpose of Payment |
|------------|-----------|--------|--------------------|
| 2/24/2004 | 401670 | $12,135.94 | March Rent & Utilities |
| 1/27/2004 | 401431 | $12,135.94 | Feb. Rent & Utilities |
| 12/29/2003 | 400804 | $12,135.94 | Jan. Rent & Utilities |
| 11/25/2003 | 400531 | $12,135.94 | Dec. Rent & Utilities |
| 11/11/2003 | 400411 | $1,920.00 | Nov. Utilities |
| 10/29/2003 | 400350 | $10,215.94 | Nov. Rent |
| Total | | $60, 679.70 | |

*Nucentrix*, 314 B.R. at 585. "Savoy accepted and deposited into its account each of the above

referenced checks, with only one minor complaint, mentioned below." *Id.* at 586.

"Savoy had policies in place to deal with situations where its tenants failed to timely and

fully [sic] payment. Specifically, if rent was not timely and fully paid, Savoy would send out a

'late notice' and contact the tenant to discuss the payment of rent." *Nucentrix*, 314 B.R. at 586.

If such conduct failed to obtain payment in full, "Savoy would send out a stronger demand letter

and possibly a lock out notice." Yet, "[d]espite the existence of these procedures, at no time

from November 1, 2003 through March 31, 2004 did Savoy or its representatives demand any

payment from [Nucentrix] beyond the Reduced Rent. *Id.*

---

[6] During the five months in question, November 2003 through March 2004, Nucentrix paid a total amount of $60,679.70 to Savoy. *Nucentrix*, 314 B.R. at 585.
**3:04-CV-2520-P**
**Order REVERSING Decision of the Bankruptcy Court, and REMANDING for Entry of Judgment**
**Page 4**

"The only time that Savoy contacted Nucentrix about any underpayment of rent was in early November 2003, regarding Nucentrix's first payment of Reduced Rent." Resp. Br. at 6; *cf.* *Nucentrix*, 314 B.R. at 586.  More specifically, "[o]n October 29, 2003, [Nucentrix] issued a check to Savoy in the amount of $10,215.94 for the base November rent. *Nucentrix*, 314 B.R. at 586.  Thereafter, Savoy informed Nucentrix of the $1,920.00 deficiency related to utilities, parking, and operating expenses.  Nucentrix then issued another check for the balance, so that it paid Savoy $12,135.94 for November rent. *Id.*  Subsequently, Nucentrix "continued to pay, and Savoy continued to accept, this exact amount . . . without any notice of any other amount due and owing until the filing of Savoy's Motion to Compel Payment of Debtors' Post-Petition Obligations under Non-Residential Real Property Lease ("the Rent Motion") on February 24, 2004." Resp. Br. at 7; *Nucentrix*, 314 B.R. at 586.

"[O]n November 10, 2003, [Nucentrix] forecasted 'Rents & Office Expense' approximately commensurate with the Reduced Rent in the budget (the 'DIP Budget') that they submitted to the Court as part of their motion to approve debtor in possession financing." *Nucentrix*, 314 B.R. at 586.  The Bankruptcy Court held that Nucentrix submitted such a budget "[i]n reliance of the representations of Savoy . . . ." *Id.*  However, Nucentrix may have made its forecast because of a belief that the parties would ultimately reach agreement in all of the outstanding issues they were negotiating.  Indeed, during oral argument before this Court on April 20, Nucentrix and Savoy acknowledged they nearly consummated an agreement regarding the post-petition rent.

### a.      Subsequent Representations

Notwithstanding earlier discussions between McHenry and Billingsley, the following events took place thereafter. First, on October 6, 2003, Nucentrix filed its Second Amended Motion to Extend Time to Assume or Reject Unexpired Leases of Non-Residential Real Property. Therein, Nucentrix stated its intent to perform its lease obligations in accordance with section 365(d)(3). Appellant's R. Volume 2 at 215 (requesting an extension of time "to assume or reject unexpired leases of non-residential real property, and, pursuant to Bankruptcy Code § 365(d)(3), the time for performance of obligations arising under any unexpired lease of non-residential real property").

As noted earlier, the Bankruptcy Court granted several requests to extend the time to assume or reject the Lease. *See supra* note 3; *see also* Appellant's R. Volume 2 at 245 (agreed order to extend time to assume or reject, filed November 10, 2003); Appellant's R. Volume 2 at 248 (requesting the same, filed December 9, 2003); Appellant's R. Volume 3 at 328 (requesting the same, filed February 13, 2004). However, the Bankruptcy Court denied Nucentrix's request that its § 365(d)(3) *obligations* be extended. *Compare* Nucentrix's Second Amend Motion to Extend Time to Assume or Reject Unexpired Leases of Non-Residential Real Property ("By this . . . Motion, [Nucentrix is] specifically seeking a Court authorized extension of the time for performance for sixty days.") *with* Order Extending (I) Time to Assume or Reject Unexpired Leases of Non-Residential Real Property and (II) Extending Time for Performance Thereunder ("With regard to the lease entered into with Savoy . . . [Nucentrix's] obligations under § 365(d)(3) . . . shall not be extended."). Appellant's R. Volume 2 at 219; 243.

Second, during the last week of October 2003, James Ilkenhans ("Ilkenhans"), counsel for Savoy, testified that he told counsel for Nucentrix that "Savoy would only enter into [a new lease] if [Nucentrix] and Savoy reached an agreement on *all other* aspects of the Lease negotiations," which included "the amount of the rejection damages claim that [Appellant] would be entitled to." Ilkenhans Aff. ¶ 6; *see also* ¶ 5 (Appellant's R. Volume 8 at 1549).

Thereafter, on November 4, 2003, Nucentrix sent Savoy a draft of a settlement motion ("First November draft") that contained the following reservation of rights language. "[Nucentrix . . . acknowledges] that [*Savoy*] *has reserved*, should this Motion not be approved, *all rights* to assert claims against [Nucentrix] . . . for any and all amounts due under and related to the Current Lease." Appellant's R. Volume 12 at 2477 (emphasis added). Subsequently, on November 21, 2003, Savoy sent Nucentrix a response draft ("Second November draft") that stated:

> [Nucentrix has] reserved, all rights under the [Lease] should this [settlement agreement] not be approved. In addition, [Nucentrix acknowledges] that [*Savoy*] has also reserved, and *hereby reserves*, all rights with respect to the [Lease], including, without limitation, *the right to file requests for administrative expenses* against [Nucentrix] for any and all amounts due under and related to the [Lease], should this [settlement agreement] not be approved.

Appellant's R. Volume 12 at 2494 (emphasis added). Additionally, on February 2, 2004, Savoy sent Nucentrix another draft ("February draft") that contained identical reservation of rights language. *See* Appellant's R. Volume 12 at 2516. All three drafts reflect that Savoy reserved all rights to assert claims for any and all amounts due under and related to the Lease. Furthermore, because Nucentrix constructed the First November draft, they apparently agreed with that reservation.

### b.   Premises Vacated

"In February 2004, Savoy found a new tenant" for the leased premises, and Nucentrix "agreed to vacate the premises entirely by March 31, 2004. In order to do so, [Nucentrix] obtained Court approval of and entered into a new lease for new office space." *Nucentrix*, 314 B.R. at 587. Within approximately two weeks, Nucentrix negotiated new office space, and moved all personal properties from the Savoy premises into the new space. *Id.*

## II.   Standard of Review

This Court reviews a bankruptcy court's findings of fact under the clearly erroneous standard and decides issues of law de novo. *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003); *Matter of Christopher*, 28 F.3d 512, 514 (5th Cir. 1994). A finding of fact is clearly erroneous when, although there is enough evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. *Id.* While conducting this review, a court must be "particularly mindful of 'the opportunity for the bankruptcy judge to determine the credibility of the witnesses'", whenever applicable. *In re Young*, 995 F.2d 547, 548 (5th Cir. 1993) (quoting Bankruptcy Rule 8013). Finally, "mixed questions of law and fact are reviewed *de novo*." *Jones v. Cain*, 227 F.3d 228, 230 (5th Cir. 2000).

### a.   Admission of Evidence

"At the outset, the admission or exclusion of evidence is largely within the discretion of the trial court." *Reichenbach v. Smith*, 528 F.2d 1072, 1074 (5th Cir. 1976). Furthermore, "[a]bsent an abuse of discretion, as shown by 'manifest error', this Court will not reverse the decision of the [Bankruptcy] [J]udge." *Id.* (citing *Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 535 (5th Cir. 1974)).

Appellant contends that "[a]lthough a court's ultimate decision to admit evidence under Federal Rule of Evidence 408 may be reviewed for abuse of discretion, the threshold matter of whether such evidence is offered for 'another purporse' is subject to *de novo* review." App.'s Br. at 4 (citing *Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir. 1984)). The Court finds this contention erroneous. "As a general proposition, a trial court has broad discretion as to whether to admit evidence of settlement negotiations offered for 'another purpose.'" *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2nd Cir. 1989) [hereinafter *Trebor*] (citing *Belton*, 724 F.2d at 505). Furthermore, "the decision to admit or exclude evidence proffered for other purposes will be reversed only for an abuse of that discretion." *Bhandari v. First Nat'l Bank of Commerce,* 808 F.2d 1082, 1103 (5th Cir. 1987); *see also Trebor*, 865 F.2d at 511 ("Absent an abuse of discretion 'amounting to manifest error,' we are not apt to reverse a district court's determination as to whether proffered evidence of settlement negotiations comes within this exception to Rule 408."). In sum, "this Court's review of the Bankruptcy Court's admission of the evidence relating to [Appellant's] offer to reduce the rent in exchange for [Appellee] foregoing its right to reject the Lease is only reviewed for an abuse of discretion amounting to manifest error." Resp. Br. at 12.[7]

---

[7] Additionally, the Court finds Appellant's dichotomy of *Belton* confusing and erroneous. In *Belton* the Fifth Circuit reviewed two instances of the trial court admitting evidence for another purpose under Rule 408. In the first instance, the Fifth Circuit found that "[t]he trial court's ruling that the fact of settlement by fifteen co-defendants was admissible [and] did not violate Rule 408 because the evidence was not offered to prove liability or the amount of damages." *Belton*, 724 F.2d at 505. Although Appellant stated originally that first instance was subject to "abuse of discretion" review, it altered its stance in its Reply. *Compare* App.'s Br. at 4 ("The Fifth Circuit reviewed the trial court's decision to admit that [first instance] evidence for abuse of discretion.") *with* Reply Br. at 2 ("[O]nly after the Fifth Circuit concluded that [the first instance] evidence did not violate Rule 408 because the evidence was not offered to prove liability or the amount of damages [did] it [review] the trial court's ultimate decision to admit such evidence offered for another purpose for abuse of discretion.") (internal citations omitted). In the second instance under *Belton*, the Fifth Circuit found that "[t]he court's instructions on the settlement amount . . . [did] not fall within any exception to Rule 408," and therefore ruled the decision error. While Appellant claims the second instance was subject to "*de novo*" review, the opinion does not support this proposition. "Although the *Belton* court did not use the term 'manifest' in subsequently calling the instruction error [in the second instance], nothing in the opinion states
3:04-CV-2520-P
**Order REVERSING Decision of the Bankruptcy Court, and REMANDING for Entry of Judgment**
**Page 9**

### III.   Rule 408

Appellant's first appellate argument alleges that the Bankruptcy Court admitted the

negotiation evidence in violation of Rule 408 of the Federal Rules of Evidence.  Rule 408

provides in pertinent part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or
> offering or promising to accept, a valuable consideration in compromising or
> attempting to compromise a claim which was disputed as to either validity or
> amount, is not admissible to prove liability for or invalidity of the claim or its
> amount.  Evidence of conduct or statements made in compromise negotiations is
> likewise not admissible . . . This rule also does not require exclusions when the
> evidence is *offered for another purpose*, such as proving bias or prejudice of a
> witness, negativing a contention of undue delay, or proving an effort to obstruct a
> criminal investigation or prosecution.

Fed. R. Evid. 408 (emphasis added).

Appellant argues two, albeit somewhat interconnected reasons why the Bankruptcy Court

erred.  First, it contends that "Rule 408 expressly bars the admission of [the evidence in

question] because such evidence is "necessarily offered to prove the invalidity of a claim that

was the subject of settlement discussions."  App.'s Br. at 14 (citing *Belton v. Fibreboard Corp.*,

724 F.2d 500, 505 (5th Cir. 1984)).  Second, it claims the Bankruptcy Court relied improperly on

precedent concerning exceptions to Rule 408.  *See generally* App.'s Br. at 16, 18.  Appellee

addresses each of these arguments, as well as asserting additional reasons why the Court should

deny Appellant's appeal.

---

that the court gave no deference to the trial court or that it changed its standard of review from abuse of discretion to
*de novo* in mid-stream."  Resp. Br. at 12 n.6.

### a.    Existence of Controversy

Appellee's first response to Appellant's Rule 408 arguments purports there was no existing and disputed claim at the time of the negotiations. *See, e.g.*, Resp. Br. at 16 ("Savoy never initiated any adversary proceeding against Nucentrix, and it did not file a proof of claim or assert any other type of claim in this case until January 12, 2004."). Hence, because Rule 408 requires an existing and disputed claim, Appellant's first appellate argument falters.

Despite Appellee's claim to the contrary, this Court believes a disputed claim existed at the time of the negotiations. Appellee filed its bankruptcy cases on September 5, 2003, *"before the settlement discussions at issue took place."* Reply Br. at 10 (emphasis added); *see also Nucentrix*, 314 B.R. at 583. As a result, it altered the rights of Appellant under the Lease. Additionally, the previous court tacitly concluded that a disputed claim existed. "Instead of finding that the representations were not settlement negotiations, and therefore not subject to Rule 408 at all, the [B]ankruptcy [C]ourt determined that the representations were evidence of conduct or statements made in compromise negotiations, but nonetheless admissible . . . for another purpose." Reply Br. at 5 (internal citations omitted); *see also Nucentrix*, 314 B.R. at 587-88. As such, this Court finds there were existing and disputed claims at the time of the negotiation discussions.[8]

---

[8] Additionally, Appellant asserts that Appellee is judicially estopped from arguing that the disputed discussions were not settlement discussions subject to Rule 408. Specifically, because Appellee "expressly acknowledged at [a previous bankruptcy hearing] that the representations were evidence of compromise negotiations subject to Rule 408," it now cannot claim otherwise. Reply Br. at 4. Although Appellee addresses this argument to some extent, *see, e.g.*, Resp. Br. at 18 n.9 and accompanying discussion, the Court need not decide the validity of this argument.

3:04-CV-2520-P
Order REVERSING Decision of the Bankruptcy Court, and REMANDING for Entry of Judgment
Page 11

### b. "Another Purpose" Exception

Appellee's second response to Appellant's Rule 408 arguments alleges that the Bankruptcy Court admitted the negotiation evidence in accordance with recognized exceptions. Rule 408 "permits settlement evidence for any purpose except to prove or disprove liability or the amount of the claim." *United States Aviation Underwriters, Inc. v. Olympia Wings, Inc.*, 896 F.2d 949, 956 (5th Cir. 1990) (citing *Belton*, 724 F.2d at 505). Moreover, the Bankruptcy Court "has broad discretion in determining whether to admit evidence of settlement for another purpose and [this Court] will not disturb that decision lightly." *Id.* (citing *Rechenbach*, 528 F.2d at 1074.

After reviewing the Bankruptcy Order and considering the supporting caselaw, this Court finds the Bankruptcy Court properly allowed evidence of Appellant's representations. Although there is no Fifth Circuit caselaw on point, "[c]ourts in many jurisdictions have held that Rule 408 does not exclude evidence of statements made during settlement negotiations when such statements are being offered to prove estoppel." Resp. Br. at 19 (citing *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 292 (2nd Cir. 1999); *Bankcard America, Inc. v. Universal Bancard Systems, Inc.*, 203 F.3d 477, 484 (2nd Cir. 2000); *John C. Lincoln Hospital and Health Corp. v. Maricopa County*, 96 P.3d 530, 536 n.3 (Ariz. Ct. App. 2004); *Carolina Indus. Products, Inc. v. Learjet, Inc.*, 168 F.Supp.2d 1225 (D. Kan. 2001)). Indeed, the Bankruptcy Court offers persuasive authority that supports this position, namely *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 292 (7th Cir. 1999), and *Bankcard American, Inc. v. Universal Bancard Systems, Inc.*, 203 F.3d 477, 484 (2nd Cir. 2000), both of which admitted evidence obtained during negotiations

because the evidence was offered for "another purpose." Appellant does not dispute the validity

of these decisions, but rather attempts to distinguish their facts and posture. However, such

arguments fail in their logic.

First, Appellant claims that in stark contrast to the estoppel claims in *Starter*, "which had

absolutely nothing to do with the validity or invalidity of the trademark infringement claims

being negotiated by the parties, [Appellee's] estoppel defense goes directly to the validity or

invalidity of the Rent claim," App.'s Br. at 17, which was the subject of settlement discussions

between McHenry and Billingsley. However, the Bankruptcy Court did not use any settlement

evidence to *prove* the validity or invalidity of the rent claim. Rather, the Bankruptcy Court used

that evidence to *estop* Appellant's Rent Motion. Granted, the admission of evidence "offered for

another purpose," such as proving bias or estoppel, may also relate to the actual claim of

settlement discussions. *See Trebor*, 865 F.2d at 510 (finding that the negotiation evidence

offered for another purpose was too closely related to the ultimate validity of the negotiation).

However, the trial court, or Bankruptcy Court in this case, decides *for what purpose* the evidence

was offered. *See id.* at 511 ("As a general proposition, a trial court has broad discretion as to

whether to admit evidence of settlement negotiations offered for 'another purpose.'"). As such,

this Court finds no reason to disturb the finding of the lower court.

Second, Appellant urges *Bankcard* is invalid because "the settlement discussions in

*Bankcard* were offered to prove a party's state of mind and conduct after failed settlement

negotiations, not the invalidity of a claim that was the subject of those negotiations, as in this

case." App.'s Br. at 18-19. Such a claim misreads *Bankcard*, as well as the Bankruptcy Order.

Similar to the case at hand, *Bankcard* involved an alleged breach of contract by a second party

against a first party. Therein, the second party defended its actions by claiming such activity would not have occurred but for settlement negotiations and the first party's affirmations. *Bankcard*, 203 F.3d at 483-84. The Seventh Circuit ruled such evidence admissible. "[I]t would be an abuse of Rule 408 to let [the first party] lull [the second party] into breaching the contract and then prevent [the second party] from explaining its actions because the lulling took place around the settlement table." *Id.* at 484. Additionally, the "testimony [in question] was admitted to show [the second party's] state of mind *and* to explain [its actions]." *Id.* (emphasis added). Such logic applies with equal force to the case *sub judice*.

Indeed, the Court finds that *Bankcard* applies with full force to the current situation. "The purpose of Rule 408 is to encourage settlements." *Id.* However, "[s]ettlements will not be encouraged if one party during settlement talks seduces the other party into violating the contract and then, when a settlement ultimately is not reached, accuses the other party at trial of violating the contract." *Id.* In sum, "[t]o use Rule 408 to block evidence that the violating of the contract was invited would be unfair." *Id.* The Bankruptcy Court mirrored this logic explaining that "[i]t would be unfair for Savoy to make representations to [Nucentrix] that [Nucentrix] clearly relied upon, and then hide behind Rule 408. The Rule was not written for such purposes."[9] *Nucentrix*, 314 B.R. at 588.

---

[9] The Court does not believe that such an exception to Rule 408 will swallow the rule or stifle negotiations. While it is true that "a principal purpose of Rule 408 is to encourage settlements by preventing evidence of a settlement (or its amount) from being used against a litigant who was involved in a settlement," *Kennon v. Slipstreamer, Inc.*, 794 F.2d 1067, 1069 (5th Cir. 1986) (emphasis removed), it is also true that if parties know they cannot be seduced into action only to be blind-sided later, such logic will also encourage negotiations and settlements.

Moreover, there can be no question as to *why* the Bankruptcy Court admitted the settlement evidence. It stated unequivocally that "Rule 408 allows the admission of evidence of conduct or statements made in compromise negotiations when the evidence is offered for another purpose such as, *in this case, estoppel.*" *Nucentrix*, 314 BMay 16, 2005.R. at 587 (internal citations omitted) (emphasis added). Any claim to the contrary is patently incongruous with the Bankruptcy Order. Again, "[i]t is the conduct and words used in the discussions that go to the heart of [Nucentrix's] estoppel defense. Such conduct and words are admissible under Rule 408." *Id.* at 588.

In sum, after considering the facts and precedent involved, this Court finds no reason to believe the Bankruptcy Court erred in admitting negotiation evidence under Rule 408 of the Federal Rules of Evidence.

## IV.    Promissory Estoppel

Appellant's final appellate argument claims that the Bankruptcy Court "erred in concluding that Nucentrix had proven all the required elements of promissory estoppel to estop Savoy from collecting the Rent Claim and Attorney's Fee Claim from Nucentrix." App.'s Br. at 22-23. The elements of promissory estoppel are: (1) a promise, (2) foreseeability of reliance on the promise by the promisor; and (3) detrimental reliance by the promisee. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983); *Nucentrix*, 314 B.R. at 589. "Texas courts have also established a fourth and separate requirement of a 'definite finding that injustice can be avoided only by the enforcement of the promise.'" *Clardy Mfg. Co. v Marine Midland Bus. Loans*, 88 F.3d 347, 360 (5th Cir. 1996) (quoting *City of Beaumont v. Excavators & Constructors, Inc.*, 870 S.W.2d 123, 137 (Tex.App.--Beaumont 1993, write denied) (emphasis removed). Finally,

"courts have emphasized that 'estoppel requires a *reasonable* or *justified* reliance on the conduct or statement of the person sought to be estopped by the person seeking the benefits of the doctrine.'" *Id.* (quoting *Traco Inc. v. Arrow Glass Co.*, 814 S.W.2d 186, 190 (Tex.App.--San Antonio 1991, writ denied).

### a.     Bankruptcy Court Approval

Appellant argues first that reliance was neither reasonable nor foreseeable because any settlement agreement required Bankruptcy Court approval.[10]  Specifically, it argues that "[u]nder Federal Rule of Bankruptcy Procedure 9019, a debtor cannot bind its estate to a settlement agreement absent notice, hearing, and bankruptcy court approval of the settlement." App.'s Br. at 25 (citing Fed. R. Bankr. P. 9019).  That rule reads in relevant part that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019.  Again, the Court finds this rule to be inapposite to the current situation.

As Appellee emphasizes, "Rule 9019 applies only to compromise and arbitration." Resp. Br. at 31-32, neither of which occurred in this case.[11]  As stated before, the Bankruptcy Court, as well as both parties, either acknowledged or conceded the lack of an agreed settlement.  Even assuming *arguendo* that "a debtor cannot bind its estate to a settlement absent notice, hearing, and bankruptcy court approval of the settlement," Reply Br. at 16 (citing Fed. R. Bankr. P. 9019), that rule would not apply because there was no settlement.

---

[10] Although Appellant argued initially five reasons reliance was neither reasonable nor foreseeable, it later reduced the arguments to three. *Compare* App.'s Br. at 23-27 *with* Reply Br. at 16-18.  As Appellant does not argue them further, the Court considers only Appellant's three listed reasons.

[11] Rule 9019 states "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement," and "[o]n stipulation of the parties to any controversy affecting the estate the court may authorize the matter to be submitted to final and binding arbitration." Fed. R. Bankr. P. 9019

Moreover, bankruptcy courts are courts of equity. *Pepper v. Litton*, 308 U.S. 295, 304 (1939). As such, "[t]hey have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Id.* To reverse the Bankruptcy Court on this point would belie the logic of its previous decision.

### b.    Reservation of Rights

Additionally, Appellant asserts that reliance was neither reasonable nor foreseeable because the Second November and February settlement drafts "clearly reserved all rights of [Appellant] to seek the full amount of the Rent Obligation unless any agreement reached by the parties was approved by the [B]ankruptcy [C]ourt."[12] Reply Br. at 18-19. Appellee's response that the September representations contained no such reservation language misses the point. As Appellant notes, "[Appellee] cannot pick and choose which representations they rely upon for their promissory estoppel defense, and ignore all other representations that make clear that any reliance by the [Appellee] . . . that [Appellant] would not seek to recover the full amount of the Rent Obligations was not reasonable or foreseeable." *Id.* Moreover, *Appellee* composed the First November draft, which specifically reserved the right of Appellant to seek "any and all amounts due under and related to the Current Lease." Appellant's R. Volume 12 at 2477.

While the Appellant sent the Second November draft approximately two months after the September representations, it lends credence to Appellant's argument that continued negotiations between Appellant and Appellee—shortly after the September representations—included

---

[12] As the Court finds that reliance was not reasonable in light of the draft motions in which Appellant reserved its rights, the Court does not consider the argument that reliance was neither reasonable nor foreseeable because any modification to the Lease had to be in writing and signed.

discussing "the amount of [Appellant's] rejection damages on account of the rejection of the Lease . . . ." App.'s Br. at 9 (citing Appellant's R. Volume 11 at 4465-65. Even accepting all of Appellee's representation evidence as true, these drafts and other succeeding evidence exists which destroy the foreseeability of reliance on the alleged promise by the promisor. *See English*, 660 S.W.2d at 524.

Nearly contemporaneous with the September representations, are the undisputed representations of Appellant's counsel, stated earlier. Ilkenhans testified that counsel for Appellee explained that "he understood that [Appellant] would only enter [a new lease] if [Appellee] and [Appellant] reached an agreement on *all other* aspects of the Lease negotiations." Ilkenhans Aff. ¶ 6 (Appellant's R. Volume 8 at 1549) (emphasis added). Additionally, Ilkenhans communicated to opposing counsel that he "would not present the Proposed Lease to [Appellant] for execution prior to the resolution of all issues concerning the restructuring of the Lease, including the amount of the rejection damages that Savoy would be entitled to."[13] *Id.* Importantly, Ilkenhans representations occurred before, or simultaneous with, the rent payment for October. *See id.* ¶¶ 4, 5 (Appellant's R. Volume 8 at 1549). At that point, Appellant received full notice of Appellee's intentions. "Thus, even assuming that [Appellee] reasonably relied on [] Billingsley's mid-September representations to [] McHenry . . ., Ilkenhans' later

_____

[13] "The authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because *rejection can release* the debtor's estate from burdensome obligations that can impede a successful reorganization." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) (emphasis added). While a court treats a rejection as a breach, "[t]he 'claim' created by the rejection of the contract or lease is then afforded treatment similar to all other *unsecured* claims . . . ." *In re National Gypsum Co.*, 208 F.3d 498, 505 (5th Cir. 2000) (emphasis added). However, "[i]f an executory contract is neither assumed nor rejected, it will 'ride through' the proceedings and be binding on the debtor even after a discharge is granted, thus allowing the non-debtor's claim to survive the bankruptcy." *Id.* at 504.

**3:04-CV-2520-P**
**Order REVERSING Decision of the Bankruptcy Court, and REMANDING for Entry of Judgment**
**Page 18**

representations to [Appellee's] General Counsel . . . put [Appellee] on notice of [Appellant's] position and upset any reasonable reliance as a matter of law." Reply Br. at 20.

Finally, the continued motions to extend time to assume or reject evidence an intent by Appellee to fulfill its lease obligations. The fact that Appellee continued to file such motions *after* the September discussions buttresses the notion that settlement negotiations were not yet complete.

Taken separately, each of these categories casts doubt on reasonable reliance; taken together, they seem to destroy it completely. In sum, Appellee could not have reasonably inferred that the September discussions resulting in reduced rent would be a permanent concession. Accordingly, this Court finds that the Bankruptcy Court erred in applying promissory estoppel.[14] Furthermore, the decision was clearly erroneous in light of the fact that reasonable reliance could not have developed in light of the draft motions, affidavits, and extending motions before the Bankruptcy Court. Therefore, this Court REVERSES the Bankruptcy Order.

## VI.    Conclusion

Having thoroughly reviewed the appellate record, the arguments of the parties, and the relevant law, this Court is of the opinion that the Bankruptcy Order denying Savoy's request for postpetition rent should be REVERSED. Accordingly, the case is REMANDED to the Bankruptcy Court for entry of judgment consistent with this Memorandum Opinion and Order.

---

[14] Because the Court reverses the Bankruptcy Order on the basis of promissory estoppel, it does not address whether Texas Civil Procedure Rule 11 prohibits Appellee from enforcing the September discussions. *See* Tex. R. Civ. P. 11; *Sadler v. Bank of America*, No. 04-03-00706-CV, 2004 WL 1392325 (Tex.App.--San Antonio June 23, 2004, no pet.).

**It is so ordered.**

Signed this ₁₀ᵗʰ day of June 2005.


JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE

# CASE CLOSED

**CASE NUMBER:** 3:04-cv-2520-P

**DATE:** 6 / 10 / 2005

**TRIAL: YES____ NO__/__**